Blair WOLFSON, Respondent,

v.

Normand BERIS, Appellant,

Employment Advisors International,
Inc., Defendant.

No. 50379.

Supreme Court of Minnesota.

July 3, 1980.

Donald D. Smith, Minneapolis, for appellant.

Shanedling, Phillips, Gross & Aaron and Richard T. Wylie, Minneapolis, for Wolfson.

Heard before TODD, YETKA, and WAHL, JJ., and considered and decided by the court en banc.

## OPINION

TODD, Justice.

Normand Beris appeals from a judgment and $60,000 damages award entered against him in favor of Blair Wolfson. The trial court ruled that Wolfson was entitled to the judgment and award because Beris breached his warranty of authority to sell real estate. Beris appeals on the grounds that no cause of action for breach of warranty of authority to sell real estate existed, and that, even if the cause of action existed, the damages award is excessive. We affirm in part, vacate in part, and remand with instructions.

The real estate involved in this case, 526 Nicollet Mall, Minneapolis, was owned by several individuals in their own names or as trustees for the benefit of others. Normand Beris was an owner of the property with an individual 5/24 ownership interest. Beris, however, had no power to sell the property on behalf of the other owners. Blair Wolfson is a self-employed real estate dealer.

In either December 1977 or January 1978, Philip Smith of the Towle Real Estate Company brought the property to Wolfson's attention. Smith had become acquainted with the property through a listing in the Commercial Multiple Listing Service which named the Draper & Kramer Inc., a real estate company, as the exclusive listing agent. Although Smith had not been retained by Wolfson, Smith, following industry custom, prepared a purchase agreement for the real estate in accord with terms provided by Wolfson. Wolfson signed the agreement on January 31, 1978.

The purchase agreement provided that Wolfson would pay $10,000 earnest money at the time he submitted the purchase agreement and .that he would pay an additional $340,000 on April 1, 1978, the date of closing. In the center of the agreement were two typed in terms:

1. This offer is contingent upon the buyer's approval of the leases, and operating expense statements.

2. In the event that buyer does not notify seller within 30 days of the acceptance date of this offer of his approval in writing of said leases and operating statements this offer shall be null and void and all earnest monies refunded.

The agreement contained other terms not relevant to this decision.

Smith forwarded the agreement and the earnest money to William Silvis of Draper & Kramer. When Silvis received the agreement, he forwarded it to Beris. On February 2, Silvis sent a letter to Smith in which Silvis said that the owners were considering the offer. He also said that Draper & Kramer would split the sales commission with Towle on a 50–50 basis.

Beris returned the purchase agreement to Silvis after he had signed it for the seller as "N. Beris agent 2–11–78". Wolfson's 30-day period to approve the documents would thus have run until March 13.

On February 13, Silvis wrote a letter to Smith in which he said in part:

I am pleased to inform you that ownership has accepted the Purchase Agreement. * * *

Ownership has informed us that, due to their ownership structure, in order for them to meet the closing date of April 1, 1978, it will be necessary for your buyer to approve said leases and operating expense statements and acknowledge acceptance in writing, no later than Tuesday, February 28. I sincerely hope that this causes no problems for you or your buyer.

Silvis testified that he "arbitrarily chose that date [February 28] to give approximately two weeks leeway" for approval of. the documents.

When Smith read about the February 28 approval date, he became concerned that it would be "terribly difficult, if not impossible" to approve the documents by February 28. Smith discussed this problem with Silvis. Smith testified that he and Silvis agreed that the date would be difficult to comply with. Because Smith felt that the date would cause problems for Wolfson, Smith ignored the date and told Wolfson that he had until March 13 to approve the documents. On March 13, Wolfson wrote to Draper & Kramer to inform it that he approved the documents.

On April 12, 1978, Beris and the other owners signed another purchase agreement to sell the real estate to Employment Advisors International Inc., for $375,000. On April 24, Wolfson brought suit against Beris for damages. Later, Wolfson amended his complaint to include a request for specific performance as to Beris' fractional share of the real estate, as well as for damages. The trial court denied specific performance because it found that Employment Advisors took title to the real estate without knowledge that Wolfson was seeking specific performance. No issue is raised concerning this finding.

At trial, Robert Boblett, an industrial realtor with Robert Boblett Associates, testified that the real estate was worth $410,000 on August 31, 1978. Beris objected to the evaluation as too remote, but the court permitted the testimony.

On cross-examination, Boblett gave testimony about several aspects of his evaluation of which three are pertinent to this decision. First, Boblett admitted that, in his evaluation, he considered the value of a lease negotiated on August 23, 1978, because the lease "was an important element in the leasing future of the building." Second, Boblett admitted that if the City Center was not going to be built across the street from the real estate, his evaluation would "probably" be different. Boblett also admitted that the City Center project had yet to begin the construction phase. Third, he admitted that if he knew about an

arms length sale of similar real estate for $350,000 in January 1978, he would have given that fact "strong consideration" in his evaluation. He said, however, that a sale price may reveal more about the wisdom of the buyer than about the value of the real estate.

After hearing this testimony, Beris moved to have Boblett's testimony withdrawn because it was based upon two factors—the City Center project and the August lease—which were not in existence in April 1978. The court let the testimony stand and said it "would take those factors into consideration."

On redirect, Boblett testified that he was one of the contract appraisers for the City Center project and that he had known about the project long before April 1978. Further, Boblett said that he knew of no factor which would have altered his evaluation if the evaluation had been undertaken in April instead of in August.

On May 25, 1979, the trial court ruled that Wolfson was entitled to $60,000 damages because the real estate had been worth $410,000 on April 12, 1978 (the date it was sold to Employment Advisors International). On June 21, 1979, the trial court issued an amendment to its order which stated in part:

> Counsel for defendant Beris desires clarification as to for whom Towle Real Estate Co. [Smith] was acting as agent. To clarify in part, the Court finds specifically that Towle was not agent for the plaintiff, Blair Wolfson.

The issues presented on appeal are:

(1) Was Smith an agent for Beris?

(2) Is Wolfson's suit precluded by the Minnesota statute of frauds, Minn.Stat. § 513.05 (1978)?

(3) Was Wolfson's approval of the documents on March 13 timely?

(4) What is the nature of a damages award in this action for breach of warranty of authority to sell real estate?

(5) Was the $60,000 damages award excessive?

■ 1. The trial court found that Smith was an agent for Beris. Since agency is a factual question, *Tonka Corporation v. Commissioner of Taxation*, 284 Minn. 185, 191, 169 N.W.2d 589, 593 (1969), the trial court's decision should not be overturned unless it is clearly erroneous. Beris contends that the trial court's finding is clearly erroneous because Beris had no idea that Smith was involved in the sale and because Beris did not authorize Smith to act as an agent for him. We reject Beris' argument because we believe that the trial court correctly applied the principle of agency to the use of the Commercial Multiple Listing Service (CMLS) in this case. Smith found a buyer for the Nicollet Mall property which was listed in the CMLS. Smith then contacted Silvis, the seller's agent listed in the CMLS. Because of their relationship under the CMLS, Smith and Silvis agreed to split the sales commission on a 50–50 basis. Smith sought no compensation from Wolfson. In this situation, Smith acted as an agent for Silvis in accord with the custom of the real estate sales industry and therefore as a subagent for Beris. The fact that Beris did not know of Smith nor authorize his actions does not change the fact that Smith acted on Beris' part in accord with the custom of the industry. *See* Restatement (Second) of Agency § 5(1) (1958).

■ 2. Beris contends that Wolfson does not have a cause of action for breach of warranty of authority to sell real estate because that action must be based upon an enforceable contract for the sale of land. Beris contends that there was no enforceable contract in this case because the Minnesota statute of frauds, Minn.Stat. § 513.-05 (1978), voided the alleged contract and because Wolfson's approval of the documents on March 13 was untimely. We find both arguments unavailing.

Beris' argument concerning the statute of frauds misconceives the basis of this suit. The statute of frauds considers as void any contract for the sale of land signed by an agent unless the agent has written authority to make the contract for his principal. Beris' lack of written authority to contract

for the real estate sale thus voids the contract's enforceability against the owners of 525 Nicollet Mall. Beris' lack of written authority, however, does not preclude this suit for breach of warranty of authority to sell real estate. In such suits, the key fact is not whether a contract binding on the principal has been created, but rather whether the agent purports to make a contract binding on the principal. We adopt the position of the Restatement:

## AGENT WHO WARRANTS AUTHORITY

A person who purports to make a contract, conveyance or representation on behalf of another who has full capacity but whom he has no power to bind, thereby becomes subject to liability to the other party thereto upon an implied warranty of authority, unless he has manifested that he does not make such warranty or the other party knows that the agent is not so authorized.

Comment:

a. * * *

When an agent purports to make a contract, conveyance or representation for a principal, the other party thereto can reasonably assume from such conduct that the agent represents that he has power so to bind the principal. Hence, the rule stated in this Section results from the fact that the agent purports to act as such, although he makes no express representation as to his authority. The agreement by the other party to enter into the transaction with the principal is consideration given by him, so that the representation by the agent becomes effective as a warranty.

Restatement (Second) of Agency § 329 (1958). The purported contract's unenforceability against the owners because of the statute of frauds has no effect on Wolfson's cause of action.

3. We recognize that the cause of action for breach of warranty of authority to contract can only exist if the parties purport to have made a legally binding contract. Restatement (Second) of Agency § 329, Comments a & j (1958); 1 F. Mechem, *Law of Agency* § 1401 (1914). Thus, Beris' argument that Wolfson does not have a cause of action because Wolfson failed to approve the documents before March 13 would be correct if, by his action, Wolfson had failed to conform to the requirements of a counteroffer. In this case, however, no counteroffer requiring approval of the documents before March 13 was communicated to Wolfson. Beris told Silvis to have the documents approved by March 10. Silvis told Smith to have the documents approved by February 28, but Smith told Wolfson to have the documents approved by March 13. Since Smith was Beris' subagent, Wolfson was entitled to rely on the March 13 date. The discussions about other dates by Beris, Silvis, and Smith were not binding on Wolfson unless they were communicated to him. *McCray v. Buttell*, 149 Minn. 487, 493, 184 N.W. 191, 194 (1921); 2A C.J.S., *Agency*, § 165 (1972). Thus, Wolfson's approval of the documents on March 13 was timely and in satisfaction of all requirements for creation of a purportedly legally binding contract.

4. In *Skaaraas v. Finnegan*, 31 Minn. 48, 51, 16 N.W. 456, 457 (1883), we said: "If the plaintiffs recover we are of opinion that they are entitled to damages for the loss of their bargain." Today, we reaffirm our position that the plaintiff, Wolfson, is entitled to the benefit of the bargain for which he thought he had contracted. In *Skaaraas*, however, we also said:

If the defendant falsely assumed authority to sell and convey the property, the wrong was immediate, and the just measure of damages is the difference in value between what plaintiffs would have got if the assumed authority had existed, and what they did get. * * * Their loss is, then, the difference between the value of the price which they agreed to pay, and the market value of the property *at the time when the agreement was made*.

*Id.* The trial court did not calculate damages as of the time the agreement was made (March 13), but rather calculated damages as of the date of the resale (April

12). Because we believe that a damages calculation based upon either date cannot properly reflect Wolfson's loss of the bargain in this case, we will remand this case for a new damages determination under a modification of the *Skaaraas* rule.

Wolfson's benefit of the bargain, if Beris had been an authorized agent, would be more than just the difference between the property's contract price and its market value on the day of sale. Wolfson would also benefit from the fact that he had a continuing contractual interest in the Nicollet Mall property. As the property value rose, Wolfson's benefit of the bargain would also rise. So long as Wolfson reasonably believed that he had a contract for the sale of the property, he would continue to benefit from the contract. Only when Wolfson learned of Beris's lack of authority would Wolfson become aware that he had been damaged and that he must procure another comparable property. Thus, we hold that in this case the measure of Wolfson's damages includes not only the difference between the property's contract price and its market value on the day of sale, but also any increase in the value of the property up until the time Wolfson learned that Beris lacked authority to contract for its sale. *See* Restatement (Second) of Agency § 329, Comment j (1958). On remand, therefore, the parties will have to present evidence which will allow the trial court to calculate Wolfson's benefit of the initial sales price as well as evidence of Wolfson's benefit from the increased value of the property up to the time Wolfson learned of Beris' lack of authority.

█ 5. Because this case must be remanded, we find it appropriate to state that the $60,000 award is excessive. The trial court made this award because it concluded that the property was worth $410,000 on April 12. In so concluding, the trial court obviously relied upon Boblett's evaluation of August 31. Boblett's evaluation, however, is not retroactive to April because he based his evaluation in part upon the value of a lease not negotiated until August and in part upon the future existence of the City Center project. The lease did not exist in April, however, and, although plans for the City Center had been drawn before April, the project was further developed in August than in April. Further, Boblett was not asked whether the January or April sale prices were wise ones which reflected the value of the property even though he said that bone fide sale prices might have altered his evaluation of the property. We believe that the March 13 purported sale price and the April 12 sale price may be highly probative evidence of value and that the trial court should seriously consider them as evidence of value on remand. 7A Dunnell Dig. (3rd Ed.) Evidence, § 3247(2), (5), (7), (8) (1974).

The judgment is affirmed, the award of damages is vacated, and the case is remanded for a new damages award determination made in accordance with this opinion.