728 F.2d 1006
 4 Soc.Sec.Rep.Ser. 216, Medicare&Medicaid Gu 33,636
ROCHESTER METHODIST HOSPITAL, a Minnesota non-profit
corporation, Appellee,
v.
The TRAVELERS INSURANCE COMPANY, a Connecticut corporation,
U.S. Department of Health and Human Services, Appellant.
ROCHESTER METHODIST HOSPITAL, a Minnesota non-profit
corporation, Appellee,
v.
The TRAVELERS INSURANCE COMPANY, a Connecticut corporation, Appellant,
U.S. Department of Health and Human Services.
ROCHESTER METHODIST HOSPITAL, a Minnesota non-profit
corporation, Appellant,
v.
The TRAVELERS INSURANCE COMPANY, a Connecticut corporation,
and U.S. Department of Health and Human Services, Appellees.
 Nos. 83-1190, 83-1260 and 83-1261.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 10, 1983.
Decided Feb. 23, 1984.
 
 James M. Rosenbaum, U.S. Atty., Minneapolis, Minn., J. Paul McGrath, Asst. Atty. Gen., Anthony J. Steinmeyer and Peter R. Maier, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellant.
 Dorsey & Whitney, William J. Keppel, Charles L. Sweeris, Minneapolis, Minn., for Rochester Methodist Hosp.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 Rochester Methodist Hospital of Rochester, Minnesota, seeks to obtain reimbursement from Travelers Insurance Company, a fiscal intermediary under the Medicare program, of costs incurred in connection with a nursing-education program. We affirm the District Court's[1] holding in favor of Rochester. The principal defense offered by Travelers is that it is protected by the sovereign immunity of the United States, its principal. We hold that this immunity does not protect Travelers from personal liability for its own tort.
 
 I. BACKGROUND
 
 2
 In 1970 Rochester State Junior College agreed with Rochester Methodist Hospital to operate jointly a nursing-education program. The College made a similar agreement with St. Mary's Hospital,[2] which is also located in Rochester, Minnesota. Under these agreements, the College provided classroom instruction, and the hospitals provided dormitory space to the nursing students, among other things.
 
 
 3
 In its Medicare cost report for the accounting period ending September 30, 1971, Rochester sought reimbursement from Travelers for costs associated with the provision of dormitory space, but, in 1972, Travelers denied the claim. Rochester protested this decision and met with Russell Mossberg, Travelers' Regional Medicare Supervisor and the "number one man" in this area, to discuss whether further action should be taken. Mossberg told Rochester that an internal appeal[3] would be fruitless. He said that the "pursuit of [further relief] would be futile because it was a closed case based on this [sic] opinion," that "there was no validity to any claim" and that Rochester should not "waste [its] time by claiming because [it was] not going to get it." Tr. 64. The District Court found, and Travelers does not contest, that Mossberg knew that St. Mary's was being reimbursed for its dormitory costs when he made these statements. Relying on Mossberg's statements, Rochester did not appeal the disallowance for 1971 and, further, did not claim the dormitory costs in its cost reports for the following cost years through 1976.[4]
 
 
 4
 In early 1977 Rochester hired an accounting firm, Robert G. Engelhart & Co., to review its Medicare reimbursement program. In February 1977 Patrick Finn of Engelhart told Rochester officials that Travelers had been reimbursing St. Mary's for its dormitory costs in connection with the joint nursing program. Rochester immediately sought reimbursement from Travelers for its dormitory costs for all prior years--from 1971 through 1976--and told Travelers that, if necessary, it would appeal to the Provider Reimbursement Review Board (PRRB).[5] On March 1, 1977, Rochester officials again met with Mossberg and agreed that, because of the amount of paperwork involved, Rochester would refile and appeal to the PRRB only the 1976 cost report, and that if the PRRB ruled in Rochester's favor, Travelers would apply the ruling retroactively. The PRRB did rule in Rochester's favor, but Travelers refused to adjust the cost reports for years prior to 1975, and this action ensued.
 
 
 5
 The only factual dispute in this suit concerns the meaning of the retroactivity term in this agreement. Under HHS regulations, either an intermediary or a provider may move to reopen the intermediary's final determination of reimbursable costs with respect to matters at issue in the determination, but the motion must be filed within three years from the date of the Notice of Program Reimbursement (NPR) issued by the intermediary. 42 C.F.R. Sec. 405.1885(a) (1982). Travelers argues that the parties agreed that it would apply the PRRB decision on 1976 only "to all prior years for which a request to reopen a prior NPR remained possible under Medicare regulations," Brief for Travelers at 12, i.e., to all prior years for which a motion to reopen was not barred by the three-year limitations period. The District Court found, however, that the agreement was not so qualified, that "Mossberg represented to the plaintiff that Travelers would pay its dormitory costs for all previous years--from 1971 through 1976--if plaintiff prevailed in its PRRB appeal." Slip op. at 4.
 
 
 6
 Travelers relies on a letter written by Mossberg in 1979 in which he set forth his version of the understanding that the parties had reached in 1977. The letter states, in pertinent part, that
 
 
 7
 this is to acknowledge that we were aware that Methodist Hospital of Rochester, Minnesota did intend to refile previously settled Medicare cost reports if the ruling on the refiled cost report for cost year ending 1976 was that costs for lodging of student nurses housed in the hospital dormitory was an allowable expense of the hospital for Medicare cost reporting purposes.
 
 
 8
 * * *
 
 
 9
 * * *
 
 
 10
 It was agreed that all previously settled or submitted cost reports that fell within the refiling time frame guidelines could be refiled claiming these expenses and in this manner a ruling could be obtained. As there were several years involved, in the interest of possibly saving much unnecessary time and paper work, it was agreed that only one report for the cost year ending 1976 would be refiled at this time for the purpose of obtaining a ruling on this and if the ruling were that these expenses could be included, the other years [sic] cost reports could be refiled for proper adjustment.
 
 
 11
 Plff's Ex. 22 (emphasis added). Travelers argues that the italicized language demonstrates that reopening was subject to the three-year limitations period, and that, consequently, the District Court's finding is clearly erroneous. We disagree. Even though the letter supports Travelers' interpretation, the District Court pointed to several other items of evidence which support its conclusion. For example, Gary F. Harmon, Rochester's Director of Finance, testified that "Mossberg indicated that if we could prove our case for [1976], there would be made retroactive adjustments for all years in question, irrespective of the time frame." Tr. 67. On April 13, 1977, the Engelhart firm wrote Rochester a letter which noted that "your intermediary has already indicated that all reports from 1971 onward could be reopened if it was agreed that this area was treated improperly." Plff's Ex. 12. Kenneth Peterson, co-author of that letter, testified that the letter reflected his understanding of the agreement and that this understanding was confirmed in "numerous" subsequent conversations with Mossberg. Tr. 35-36; 37-38; 47. This issue hinges on a determination of credibility, and the District Court credited Rochester's evidence rather than Travelers'. We cannot say that this choice was clearly erroneous.
 
 
 12
 On the basis of these findings of fact, the District Court held that Travelers had committed the tort of fraud under the common law of Minnesota. Judgment was entered in favor of Rochester and against Travelers in the amount of $142,320, the total amount claimed as reimbursable for all cost years since 1971, plus interest. The District Court rejected Rochester's alternative theories of liability based on breach of implied warranty of authority and tortious misrepresentation of authority. These appeals followed.
 
 II. JURISDICTION
 A.
 
 13
 The threshold question is whether Travelers' and the government's notices of appeal are timely. This issue hinges on an understanding of the unusual procedural history of this case.
 
 
 14
 Rochester filed its initial complaint against Travelers and the Department of Health and Human Services (HHS) on October 16, 1980, alleging, in substance, that both defendants were estopped to deny its claims for reimbursement and that, in the alternative, Travelers had exceeded its authority in its dealings with Rochester. HHS, arguing that it was the real party in interest, moved to dismiss Travelers as a defendant. The District Court denied the motion on the ground that if Travelers had exceeded its authority, Rochester's remedy might be against Travelers rather than HHS. Then, one day before trial, the defendants moved to dismiss the complaint for want of jurisdiction. The Court took the motion under advisement and held a one-day bench trial. Some six months later, the District Court granted the defendants' motion to dismiss.[6] Subsequently, however, on August 30, 1982, the Court granted Rochester's motion to reconsider, transferred Rochester's claim against HHS to the United States Claims Court, and held that, since the United States was no longer a party to the case, the Court had diversity jurisdiction to hear Rochester's state-law claims against Travelers. Rochester then filed an amended complaint naming only Travelers as a defendant, alleging fraud, breach of implied warranty of authority, and tortious misrepresentation of authority. HHS responded by filing a motion to intervene, which the District Court denied on November 22, 1982. HHS did not then appeal this ruling.
 
 
 15
 On January 7, 1983, the District Court entered judgment for Rochester against Travelers based on the evidence presented at the trial on the original complaint. On February 4, 1983, 28 days after entry of judgment but 74 days after denial of HHS's motion to intervene, the United States Attorney filed a notice of appeal on behalf of HHS but, through an oversight, not on behalf of Travelers.[7] On February 17, 1983, 41 days after entry of judgment, the United States Attorney filed a notice of appeal on behalf of Travelers.
 
 
 16
 Rochester argues that neither HHS's nor Travelers' appeals are timely. It asserts that HHS ceased to be a party to the case when Rochester's claim against HHS was transferred to the Claims Court. According to Rochester, HHS had to appeal, if at all, within 60 days from the denial of its motion to intervene. Since it missed that deadline, and since as a non-party it could not appeal from the final judgment, HHS's appeal is untimely. Rochester also asserts that since Travelers' appeal was filed 41 days, rather than 30 days, after entry of judgment, its appeal is also untimely.
 
 B.
 
 17
 Rule 4(a) of the Federal Rules of Appellate Procedure provides that, in civil cases, the notice of appeal must be filed within 30 days of the entry of the judgment or order appealed from, "but if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days after such entry." We conclude that HHS, an agency of the United States, was a party for purposes of this Rule, so that Travelers had 60 days within which to appeal, and thus its appeal is timely.
 
 
 18
 The Committee Note to Rule 4(a)'s predecessor, former Fed.R.Civ.P. 73(a) (as amended in 1946), explained that the government often needs more than 30 days in which to decide whether to appeal, because several departments may be involved in the decision. "Since it would be unjust to allow the United States, its officers or agencies extra time and yet deny it to other parties in the case, the rule gives all parties in the case 60 days." Id. (quoted in 9 Moore, Ward & Lucas, Moore's Federal Practice p 203.25, at 3-102 (2d ed. 1983)). It does not follow, however, that the rule should be narrowly construed in order to foreclose appeals. Wallace v. Chappell, 637 F.2d 1345, 1347 (9th Cir.1981) (en banc) (per curiam). As Judge Friendly has observed,
 
 
 19
 It is in the last degree undesirable to read into a procedural statute or rule, fixing the time within which action may be taken, a hidden exception or qualification that will result in the rights of clients being sacrificed when capable counsel have reasonably relied on the language.
 
 
 20
 United States v. American Society of Composers, Authors & Publishers, 331 F.2d 117, 119 (2d Cir.), cert. denied, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964). Accordingly, most courts have tended to construe the Rule broadly and to apply the 60-day provision when the government has a substantial interest in the case. See, e.g., In re Paris Air Crash of March 3, 1974, 578 F.2d 264, 265 (9th Cir.1978) (per curiam) (holding that "when the United States is a named party, participates in the general action and is, or may be, interested in the outcome of an appeal, even though it is not a party to the appeal, it is a 'party' for purposes of F.R.A.P. 4(a).").
 
 
 21
 Here, HHS was named in the original complaint, was a party at trial, and took an active role in the suit until its motion for intervention was denied. Since HHS may be contractually required to indemnify Travelers, it has an interest in the outcome of the appeal. While HHS was not a named defendant at the time judgment was entered, Rule 4(a) does not require that the government be a party at the time of the judgment for the 60-day rule to apply. See East v. Crowdus, 302 F.2d 645, 646-47 (8th Cir.1962) (per curiam). Indeed, Rule 4(a) merely requires that the government be a party to the District Court action; it does not say when the government must be a party. We believe that in this case HHS's participation and interest in the case were sufficient to make it a party for purposes of Rule 4(a). Thus, Travelers' notice of appeal, which was filed 41 days after entry of judgment, was not untimely.
 
 
 22
 Our holding makes it unnecessary to decide whether HHS's appeal should be barred on the ground that it should have appealed within 60 days from the denial of its motion to intervene, because Travelers' appeal brings up all the issues that HHS seeks to raise. Accordingly, we dismiss HHS's appeal, No. 83-1190, as moot. We also dismiss Rochester's cross-appeal, No. 83-1261, as moot, because Rochester can make all its arguments, including the argument that the judgment should be affirmed on grounds rejected by the District Court, as an appellee. See Brown v. St. Louis Police Department, 691 F.2d 393, 396 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983).
 
 III. SOVEREIGN IMMUNITY
 A.
 
 23
 Next, Travelers argues that Rochester's suit against it is barred by sovereign immunity because the suit is, in fact, one against the United States. We disagree.
 
 
 24
 This is a case seeking damages against an agent for its own wrongful acts. It is well established that agents, even government agents, may be subject to liability either in tort or in contract. E.g., Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 686, 69 S.Ct. 1457, 1459, 93 L.Ed. 1628 (1949). "An instrumentality of government he might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts." Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp., 258 U.S. 549, 567, 42 S.Ct. 386, 388, 66 L.Ed.2d 762 (1922) (citations omitted). "[T]he government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work." Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939) (citations omitted). Nonetheless, if the suit is also, in effect, one against the United States, it cannot be maintained. E.g., Larson, supra, 337 U.S. at 687, 69 S.Ct. at 1460. "[T]he general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought." Pennhurst State School & Hospital v. Halderman, --- U.S. ----, ----, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) (Court's emphasis). Thus
 
 
 25
 [a] suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," Land v. Dollar, 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be "to restrain the Government from acting or to compel it to act." Larson v. Domestic & Foreign Corp., supra, at 704 [69 S.Ct. at 1468]; Ex parte New York, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921).
 
 
 26
 Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963).
 
 
 27
 A suit brought nominally against a government agent that seeks injunctive or other specific relief is much more likely to be deemed one against the United States than one that seeks damages. Normally, "[i]n a suit against the officer to recover damages for the agent's personal actions, .... [t]he judgment sought will not require action by the sovereign or disturb the sovereign's property." Larson, supra, 337 U.S. at 687, 69 S.Ct. at 1460. Accord, Scheuer v. Rhodes, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974) (where plaintiffs sought to impose personal liability for damages upon Governor and other state officials under 42 U.S.C. Sec. 1983, suit was not barred by Eleventh Amendment). "[T]he dispositive inquiry is 'who will pay the judgment?' " Stafford v. Briggs, 444 U.S. 527, 542 n. 10, 100 S.Ct. 774, 784 n. 10, 63 L.Ed.2d 1 (1980). Thus, in Stafford, where the plaintiffs sought damages from various government officials who had allegedly violated the plaintiffs' constitutional rights, the Court said,
 
 
 28
 A suit for money damages which must be paid out of the pocket of the private individual who happens to be--or formerly was--employed by the Federal Government plainly is not one "essentially against the United States," and thus is not encompassed by the venue provisions of [28 U.S.C.] Sec. 1391(e).
 
 
 29
 444 U.S. at 542, 100 S.Ct. at 783-84 (footnote omitted).[8]
 
 
 30
 Here, the fact that Rochester seeks damages only from Travelers, not from HHS, would be dispositive were it not for the indemnity agreement between Travelers and HHS. Even assuming, however, that HHS will be obligated to reimburse Travelers for the amount of Rochester's judgment, we do not believe that the suit is in fact one against the United States.
 
 
 31
 In Brady v. Roosevelt Steamship Co., 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471 (1943), the Supreme Court was confronted with an analogous argument. The Steamship Company, a privately owned corporation, operated a ship owned by the United States Maritime Commission. A customs inspector was climbing a ladder on the ship when a rung broke, and the resulting injuries caused his death. His widow, Brady, brought a wrongful death action against the Steamship Company. The question was whether the case should be dismissed on the ground that the remedies provided by the Suits in Admiralty Act,[9] i.e., a libel in personam against the United States or the Maritime Commission, were exclusive.
 
 
 32
 The Court held that the Suits in Admiralty Act did not bar suits against private agents, because there was nothing in the legislative history to suggest that the Act "was designed to abolish all remedies which might exist against a private company for torts committed during its operation of government vessels under agency agreements." 317 U.S. at 579, 63 S.Ct. at 427. According to the Court, "when it comes to the utilization of corporate facilities in the broadening phases of federal activities in the commercial or business field, immunity from suit is not favored." Id. at 580, 63 S.Ct. at 428 (footnote and citations omitted).
 
 
 33
 The withdrawal of the right to sue the agent for his torts would result at times in a substantial dilution of the rights of claimants. Assuming that the ordinary rules of agency apply in determining whether the United States or the Maritime Commission is responsible under Sec. 2 of the [Suits in Admiralty] Act for torts of private operators such as respondent, there would be instances where unless the private operator was liable no one would be. The principal is not liable for every negligent act of his agent.
 
 
 34
 Id. at 581, 63 S.Ct. at 428.
 
 
 35
 The Steamship Company tried to avoid this result by arguing, like Travelers, that the United States was contractually obligated to pay the judgment and thus was the real party in interest. The Court was not persuaded:
 
 
 36
 [I]f petitioner had a cause of action against respondent, it is difficult to see how she could be deprived of it by reason of a contract between respondent and the Commission. Immunity from suit on a cause of action which the law creates cannot be so readily obtained.... The rights of principal and agent inter se are not the measure of the rights of third persons against either of them for their torts.... The question is not whether the Commission had authority to delegate to respondent responsibility for managing and operating the vessel as its agent. It is whether respondent can escape liability for a negligent exercise of that delegated power if we assume that by contract it will be exonerated or indemnified for any damages it must pay. As stated in Sloan Shipyards Corp. v. Emergency Fleet Corp., supra, pp. 566-567 [42 S.Ct. at pp. 388] "the general rule is that any person within the jurisdiction always is amenable to the law. If he is sued for conduct harmful to the plaintiff his only shield is a constitutional rule of law that exonerates him." Furthermore, if the United States were to become the real party in interest by reason of a contract for exoneration or indemnity, a basic alteration in that concept ... would be made, not pursuant to a Congressional policy but by reason of concessions made by contracting officers of the government. Such a change would be detrimental to the interests of private claimants, as we have said, since it would subtract from the legal remedies which the law has afforded them. Beyond that it would make the existence of a right to exoneration or indemnity a jurisdictional fact. That could hardly help but complicate and delay the enforcement of rights based on these maritime torts. At least in the absence of a clear Congressional policy to that end, we cannot go so far.
 
 
 37
 317 U.S. at 583-84, 63 S.Ct. at 429-30 (footnote and citations omitted). Accord, Foster v. Day & Zimmermann, Inc., 502 F.2d 867, 875 (8th Cir.1974) ("Contractual indemnification by the government cannot artificially create sovereign immunity."); Tribe, American Constitutional Law 132-33 n. 22 (1978) ("[A] state should not be able to turn a purely intramural arrangement with its officers [for indemnity] into an extension of sovereign immunity. Alternatively, the state's voluntary extension of indemnification could be construed as a waiver of Eleventh Amendment immunity.").[10]
 
 B.
 
 38
 We recognize that a regulation promulgated under the Medicare Act provides that
 
 
 39
 [i]ntermediaries and carriers act on behalf of the Administrator in carrying out certain administrative responsibilities that the law imposes. Accordingly, their agreements and contracts contain clauses providing for indemnification with respect to actions taken on behalf of the Administrator and the Administrator is the real party of [sic] interest in any litigation involving the administration of the program.
 
 
 40
 42 C.F.R. Sec. 421.5(b) (1982). It might be argued that this language articulates a policy to clothe intermediaries with sovereign immunity. It is not, however, a policy articulated by Congress. Nor is it clear: it does not necessarily follow from the denomination of the Administrator as the real party in interest that the intermediary is relieved from all liability for its own wrongful acts. If we were to hold otherwise, there could, as in Brady, be instances where aggrieved providers such as Rochester had no legal redress. For if Rochester was relegated to a suit in the Claims Court against HHS, it could not recover damages for misrepresentation, 28 U.S.C. Sec. 2680(h) (1976), and if Rochester were to argue breach of a contract to re-open all years back to 1971, HHS might be able to defeat the claim by showing that Travelers had no authority to make such a contract.[11] E.g., Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). These considerations lead us to hold that the regulation does not abrogate the general rule that a government agent is not protected against personal liability by sovereign immunity.
 
 C.
 
 41
 There is language in opinions of several other courts of appeals to the effect that suits against fiscal intermediaries are barred by sovereign immunity, on the theory that the suit is really one against the government. Matranga v. Travelers Ins. Co., 563 F.2d 677, 677-78 (5th Cir.1977) (per curiam); Hazelwood Chronic & Convalescent Hosp. v. Weinberger, 543 F.2d 703, 704 n. 1 (9th Cir.1976), vacated on other grounds, 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977); Peterson v. Weinberger, 508 F.2d 45, 51-52 (5th Cir.), cert. denied, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975); Pine View Gardens, Inc. v. Mutual of Omaha Ins. Co., 485 F.2d 1073, 1074-75 (D.C.Cir.1973). A careful reading of these cases illustrates again how perilous it is to cite general statements in judicial opinions out of context. There are passages in each of these opinions which, if read in isolation, would support the government's position here. We do not believe these statements are controlling in the present context, for several reasons.
 
 
 42
 In the first place, in none of these cases do the courts address the rule that an agent of the government is responsible for its own torts. Apparently this argument was not made. Perhaps more to the point, in none of these cases was there proof that the intermediary acted beyond the scope of its authority. It was therefore quite reasonable to confer upon the intermediary whatever immunity the government would enjoy if sued directly. Pine View Gardens, Inc. was a simple action against an intermediary for payment claimed by the plaintiff provider to be due for certain services furnished. There was no allegation that the intermediary had committed a tort, and in fact the court's opinion indicates that the result would have been different if such proof had been present. "This is not a case" the court said, "in which the Government has given its fiscal agents funds to pay plaintiff, and in which the agent is not turning the money over to the appropriate ultimate payee." 485 F.2d at 1075. In Peterson, the court emphasized that the fiscal intermediaries "did no more than act on the instructions received by them" from the government. "Dr. Peterson wholly failed to prove tortious conduct on the part of any of the defendants...." 508 F.2d at 50. Hazelwood simply cites Peterson, and also states that the intermediary "simply followed the Secretary's regulation...." 543 F.2d at 704 n. 1. And in Matranga, although the plaintiff alleged that the intermediary was guilty of willful and wanton misconduct, there was in fact "nothing in the record to indicate that Travelers was acting outside the perimeters of its official duties in its dealings with" the plaintiff. 563 F.2d at 678.
 
 
 43
 Thus, all of the appellate opinions cited for the general proposition that sovereign immunity protects an intermediary assumed that the intermediary had committed no tort and had not exceeded the bounds of the authority conferred upon it by the government. Here, by contrast, the tort of fraud has been both alleged and proved, and the government clearly took the position, at least in the District Court, that Mossberg and Travelers clearly exceeded their authority. We do not believe that the Pine View Gardens, Peterson, Hazelwood, and Matranga courts would uphold the defense of sovereign immunity in this situation, and we also decline to do so.
 
 IV. INDISPENSABLE PARTY
 
 44
 Travelers also argues that, because HHS had a duty to indemnify or exonerate it, HHS is an indispensable party to this suit, and that since HHS's presence would have defeated diversity jurisdiction, the District Court erred in not dismissing the case. This argument fails for several reasons. In order to explain why, we first set out in full the text of Fed.R.Civ.P. 19(a) and (b):
 
 
 45
 Rule 19. Joinder of Persons Needed for Just Adjudication
 
 
 46
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.
 
 
 47
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
 
 
 48
 Under this Rule, the first inquiry is whether the party not joined meets the criteria of parts (1) or (2) of subsection (a). If it does not, the inquiry is at an end, and the motion to dismiss for failure to join the party in question must be denied. That is exactly the situation here. HHS does not fit the requirements of parts (1) or (2). Complete relief can be granted as between Rochester and Travelers without the presence of HHS. HHS does claim an interest in the action, but the entry of judgment in favor of Rochester and against Travelers will not as a practical matter impair or impede its ability to protect that interest. The United States Attorney is in the case, representing Travelers, and is making every argument that HHS would or could make if it had been allowed to intervene formally. Nor is there any risk that the absence of HHS will subject Travelers to inconsistent obligations. If Travelers is liable to Rochester, it may or may not be entitled to indemnity from HHS, but that issue is not before us now and would not be before us if HHS had been permitted to intervene. The question of indemnity will presumably be decided, if necessary, by the Claims Court in an action by Travelers against HHS.
 
 
 49
 Furthermore, even if HHS met the requirements of parts (1) or (2) of subsection (a), it would not follow that this action should be dismissed because of the impossibility of joining HHS as a party. (Recall that the joinder of HHS would destroy diversity jurisdiction and require dismissal of the entire complaint.) It would still be necessary, under subsection (b) of Rule 19, to "determine whether in equity and good conscience the action should proceed ... or should be dismissed, the absent person being thus regarded as indispensable." Consideration of the factors listed in the Rule convinces us that to dismiss this action, thus treating the absent party, HHS, as indispensable, would be completely inconsistent with equity and good conscience. We have already explained that a judgment rendered against Travelers in HHS's absence will not prejudice HHS's interests. We have also held that a judgment rendered for Rochester and against Travelers in HHS's absence will be adequate. Finally, if this action were dismissed, it is almost a certainty that Rochester would not have an adequate remedy. It cannot sue Travelers in the Claims Court. It could sue HHS there, but not on the fraud theory on which it has prevailed here, because sovereign immunity has not been waived with respect to claims of misrepresentation. 28 U.S.C. Sec. 2680(h) (1976). It is possible that Rochester could sue HHS in the Claims Court on a breach-of-contract theory, but there is always the chance that HHS might defend on the ground that Mossberg's promise was unauthorized. In short, we conclude that equity and good conscience require us to deny the motion to dismiss for failure to join HHS as an indispensable party. This conclusion is fortified by the knowledge that the only reason HHS moved to intervene was to destroy the jurisdiction of the District Court, and it is just that result that Travelers now seeks by moving to bring HHS back in as a co-defendant.
 
 V. THE MERITS
 A.
 
 50
 Under Minnesota law,
 
 
 51
 [a] person is liable for fraud if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage.
 
 
 52
 Swanson v. Domning, 251 Minn. 110, 114, 86 N.W.2d 716, 720 (1957) (footnote omitted) (quoting 8 Dunnell, Dig. (3 ed.) Sec. 3818). See also, e.g., Hanson v. Ford Motor Co., 278 F.2d 586, 591 (8th Cir.1960) (Blackmun, J.).
 
 
 53
 The District Court held that Travelers made fraudulent misrepresentations to Rochester in 1972 and 1977. We agree that Travelers is liable for Mossberg's statements in 1972, when he told Rochester that its dormitory costs were not reimbursable and that seeking further review would be futile. We do not reach the question whether Mossberg's 1977 statements also were fraudulent.
 
 B.
 
 54
 Travelers maintains that Mossberg's statements were merely opinions. This argument fails to recognize that when Mossberg made the statements, he impliedly represented that, at least to his knowledge, such costs were not being reimbursed to any provider. This, of course, was a representation of a present and material fact, and it was false: Mossberg knew that Travelers was reimbursing St. Mary's for its dormitory costs.
 
 
 55
 The Minnesota Supreme Court has made clear that half truths may amount to fraudulent misrepresentations: "To tell half a truth only is to conceal the other half." Newell v. Randall, 32 Minn. 171, 173, 19 N.W. 972, 973 (1884). As the court elaborated in Swedeen v. Swedeen, 270 Minn. 491, 134 N.W.2d 871 (1965),if a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated.
 
 
 56
 Id. at 499-500, 134 N.W.2d at 877 (quoting Thomas v. Murphy, 87 Minn. 358, 361, 91 N.W. 1097, 1098 (1902)). Further,
 
 
 57
 Though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a full and fair disclosure.
 
 
 58
 Id. at 500, 134 N.W.2d at 877-78 (quoting Borzillo v. Thompson, 57 A.2d 195, 198 (D.C.1948)) (Minnesota court's emphasis). See also Richfield Bank & Trust Co. v. Sjogren, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976) (en banc) ("One who speaks must say enough to prevent his words from misleading the other party."); Klein v. First Edina National Bank, 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972) (per curiam) (same).
 
 
 59
 Travelers argues further that, even if Mossberg misrepresented the situation to Rochester, Rochester's reliance was not justifiable. Travelers points out that the relative knowledge and experience of the parties bear on the reasonableness of the plaintiff's reliance, e.g., Clements Auto Co. v. Service Bureau Corp., 444 F.2d 169, 183 (8th Cir.1971); Midland National Bank v. Perranoski, 299 N.W.2d 404, 412 (Minn.1980), and that the District Court found that Harmon, Rochester's representative, was a "knowledgeable individual[ ] who [was] experienced in Medicare matters," slip op. at 11. Nonetheless, we agree with the District Court that Rochester justifiably relied on Mossberg's misrepresentations. Mossberg was in charge of Travelers' entire Medicare reimbursement program in Minnesota, id., and we see nothing unreasonable in Rochester's failure to appeal the denial of its 1971 claim or to include the dormitory costs in subsequent cost reports after Mossberg had told it that the costs were not reimbursable. Travelers' argument that Rochester should have claimed the costs in order to preserve its right to appeal in subsequent years misses the point: because of Mossberg's misrepresentations, Rochester did not believe that there was an issue worth appealing.
 
 
 60
 Finally, it is clear that Travelers' fraud proximately caused Rochester's loss. If Mossberg had revealed that Travelers was reimbursing St. Mary's dormitory costs, Rochester would have known that it had an issue worth pursuing. It would have been reimbursed in 1972 through Travelers' internal review process, and it would have sought and obtained reimbursement in later years. Because of the fraud, Rochester's claim is not barred by the three-year limitations period. 42 C.F.R. Sec. 405.1885(d) (1982).[12] Under "the broad remedial features of the Minnesota law of fraud," Clements Auto Co., supra, 444 F.2d at 181, the District Court properly held Travelers liable for Rochester's loss.
 
 C.
 
 61
 Travelers argues that the District Court erred in holding Mossberg's 1977 agreement to reopen prior years to be fraudulent. In light of our holding that the 1972 statements were fraudulent, we need not reach this issue. Nevertheless, even if we accept Travelers' characterization of the 1977 statements as promises rather than factual representations, Rochester could recover damages from Travelers on the theory of breach of implied warranty of authority, see, e.g., Wolfson v. Beris, 295 N.W.2d 562, 565-66 (Minn.1980), and perhaps for breach of contract or for misrepresentation of authority.[13]
 
 
 62
 The judgment of the District Court is affirmed.
 
 
 63
 HENLEY, Senior Circuit Judge, dissenting and concurring.
 
 
 64
 While in main I agree with the court's reasoning, I cannot agree that the statements made by Mossberg in 1972 constituted actionable misrepresentations. The Hospital's representatives were knowledgeable about Medicaid reimbursement, and the relationship of the parties was, over this issue at least, adversarial. Travelers' assertion that the Hospital's position was wrong, standing alone, does not seem to be a justifiable reason for refraining from further action. Without justifiable reliance, there is no actionable fraudulent misrepresentation. E.g., Berg v. Xerxes-Southdale Office Building Co., 290 N.W.2d 612, 616 (Minn.1980).
 
 
 65
 However, Mossberg's statement in 1977 concerning the years which would be reopened does seem to me to constitute fraudulent misrepresentation.[1] The district court found that Mossberg agreed to reimburse the Hospital for past years if the PRRB found in favor of the Hospital for 1976. The misrepresentation was Mossberg's implicit statement that the Hospital need take no further steps to protect its rights regarding claims for other years. Absent the fraudulent inducement, the Hospital could have filed formally to reopen some past years. Swanson v. Domning, 251 Minn. 110, 86 N.W.2d 716, 720 (1957).
 
 
 66
 However, there are time limits on reopened past filings, and Travelers' misrepresentation does not give the Hospital more rights than it would have had absent the misrepresentation. In other words, absent the misrepresentation, the Hospital would have reopened every year possible, and the misrepresentation, regardless of its actual content, does not now give the Hospital the right to reopen for claims that would have been time-barred at the time of the misrepresentation. As to those years, the Hospital simply was not defrauded of anything.
 
 
 67
 The question of what years could have been reopened in 1977 is one of some complexity, and the regulations do not clearly address the situation as I see it. See 42 C.F.R. Sec. 405.453(f)(2)(i) (1982); 42 C.F.R. Sec. 405.1885(a) (1982); Athens Community Hospital, Inc. v. Schweiker, 686 F.2d 989 (D.C.Cir.1982). Since the issue is not discussed or reached by the court's opinion,[2] there is no reason for me to address it in this opinion. Suffice it to say that insofar as the court's decision results in reimbursement of the Hospital for claims that could have been reopened in 1977, I concur, and insofar as it reimburses the Hospital for claims time-barred in 1977, I dissent.
 
 
 
 [1]
 The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota
 
 
 [2]
 Rochester and St. Mary's are tertiary-care facilities which take only patients referred to them by the Mayo Clinic. Brief for Rochester at 3 n. 2
 
 
 [3]
 At this time, "[a]n appeal procedure within the intermediary was the only recourse available to providers." Memorandum Order of the District Court filed Jan. 10, 1983 (hereinafter cited as "Slip. op."), at 3. In 1972 Congress established the Provider Reimbursement Review Board (PRRB) within HHS to review disputed reimbursement determinations for cost periods ending June 30, 1973, or later. 42 U.S.C. Sec. 1395oo (1976 & Supp. V 1981). The provider may seek review of an adverse decision by the PRRB in a federal district court. Id
 
 
 [4]
 The cost reports were for periods ending September 30, 1972, September 30, 1973, September 30, 1974, December 31, 1974, December 31, 1975, and December 31, 1976. Slip op. at 17 n. 2
 
 
 [5]
 See supra note 3
 
 
 [6]
 The District Court held that 42 U.S.C. Sec. 405(h) (1976) barred any jurisdiction that it might have under 28 U.S.C. Sec. 1331 (Supp. V 1981); that it lacked jurisdiction under 42 U.S.C. Sec. 1395oo (1976 & Supp. V 1981); and that there was no diversity of citizenship sufficient to confer jurisdiction under 28 U.S.C. Sec. 1332 (1976) because the United States is not a citizen of any state. Order of July 20, 1982, D.R. at 55. Rochester and Travelers are of diverse citizenship, but if the United States is also a party, complete diversity is destroyed
 
 
 [7]
 Both Travelers and HHS have been represented throughout the case by the United States Attorney and other lawyers in the Department of Justice
 
 
 [8]
 In Gnotta v. United States, 415 F.2d 1271, 1277 (8th Cir.1969) (Blackmun, J.), where we held that a claim for damages against individual employees of the Army Corps of Engineers for alleged employment discrimination was properly dismissed as a suit against the United States, we did not specifically address whether damages were sought from the employees individually or from the United States. Cf. Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) ("These funds will obviously not be paid out of the pocket of petitioner Edelman."); Taylor v. Jones, 653 F.2d 1193, 1205 (8th Cir.1981) (assuming that "the back pay award would be paid from public monies in the state treasury" and remanding for the District Court to consider whether the award violated the Eleventh Amendment)
 
 
 [9]
 41 Stat. 525 (1920) (current version at 46 U.S.C. Secs. 741, 742 (1976 & Supp. V 1981))
 
 
 [10]
 We also observe that under the terms of the indemnity agreement, as related to us at oral argument by the government attorney who represented Travelers, it is by no means clear that the government must indemnify Travelers for losses caused by its own fraud. The text of the contract of indemnity is not in the record. As summarized by counsel, the agreement does not entitle Travelers to reimbursement for paying a judgment occasioned by its own criminal, fraudulent, or grossly negligent conduct. Counsel argued that common-law fraud under the law of Minnesota is not the sort of fraudulent conduct referred to by the contract. Without the full text of the contract before us, we cannot begin to address that argument. In addition, for reasons we have stated in text, we do not think this action is barred against Travelers even if it is entitled to indemnity. It would be a curious rule of law indeed that would convert a promise to indemnify into a complete shield against liability for both parties to the promise
 
 
 [11]
 At trial, the Assistant United States Attorney told the District Court that "had there been such a representation [concerning an extension of the 3-year statute] it would have been clearly beyond the authority of the person that they [Rochester] allege made it." Tr. 11. At oral argument, on the other hand, counsel for Travelers and HHS said that he did not believe that HHS would or could disavow Travelers' actions. While we are convinced that counsel was sincere, we do not believe that he made or intended to make a promise that Rochester could enforce in court against the United States
 
 
 [12]
 42 C.F.R. Sec. 405.1885(d) provides in pertinent part:
 an intermediary determination ... shall be reopened and revised at any time if it is established that such determination ... was procured by fraud or similar fault of any party to the determination....
 Travelers points out that 42 C.F.R. Sec. 405.1805 (1982) defines "parties to the intermediary's determination" as "the provider and any other entity found by the intermediary to be a related organization of such provider (see Sec. 405.427)." We do not believe, however, that this definition was intended to exclude intermediaries from the operation of Sec. 405.1885(d). In any event, the promise of Mossberg, supported by consideration--Rochester's refraining from filing for reconsideration of all past years--effectively waives the limitations provision, at least so far as Travelers' personal liability is concerned.
 
 
 [13]
 The District Court held that Travelers was not liable to Rochester for breach of implied warranty of authority or for misrepresentation of authority, relying on Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), in which the Supreme Court said, "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." In Merrill, however, the question was whether the government was bound by the unauthorized representations of its agent. Here, in contrast, the question is whether the agent is responsible for the loss caused by his own unauthorized representations. Merrill does not alter the law of Minnesota on this point
 
 
 [1]
 The Hospital might also be able to recover under a quasi-contract theory
 
 
 [2]
 The majority's opinion does mention the timeliness problem, supra pages 1009-1010, but in the context of the district court's finding of fact that Mossberg's misrepresentation covered all past years, not just years that were open. I do not disagree with that finding, but I do not find it dispositive of the issue of what claims the Hospital may reopen in an action sounding in tort