Debra HENNE, et al., Plaintiffs,

v.

Dr. Gregg F. WRIGHT, etc., et al., Defendants.

No. CV88–L–167.

United States District Court,
D. Nebraska.

May 3, 1989.

Roberta S. Stick, Legal Services of Southeast Nebraska, Lincoln, Neb., for plaintiffs.

Marilyn B. Hutchinson, Asst. Atty. Gen., Lincoln, Neb., for defendants.

MEMORANDUM OF DECISION

URBOM, District Judge.

Alicia Henne and Quintessa Spidell are children who were born in Nebraska in 1985 and 1988, respectively. Given that timing, the children were named in compliance with Neb.Rev.Stat. § 71–640.01[1] for

---

1. Section 71–640.01 states:

The information pertaining to the name of an infant born in this state and reported on a birth certificate, filled out and filed pursuant to sections 71–601 to 71–648, shall comply with the following:

(1) If the mother was married at the time of either conception or birth of the child, or at anytime between conception and birth, the name of such mother's husband shall be entered on the certificate as the father of the child and the surname of the child shall be entered on the certificate as being (a) the same as that of the husband, unless paternity has been determined otherwise by a court of competent jurisdiction, (b) the surname of the mother, (c) the maiden surname of the mother, or (d) the hyphenated surname of both parents;

purposes of their birth certificates. Their mothers, plaintiff Debra Henne and intervenor Linda Spidell, bring this action individually and as next friend to their daughters seeking a declaration that Neb.Rev. Stat. § 71–640.01 is unconstitutional, an injunction enjoining the defendants from enforcing the statute and an injunction ordering the defendants to change the surnames on Alicia's and Quintessa's birth certificates.

They have sued the director of the Nebraska Department of Health, Dr. Gregg Wright, M.D., and the director of the Bureau of Vital Statistics, Stanley Cooper. The defendants contend that the state has compelling interests in the regulation of naming newborns and, therefore, the statute is not unconstitutional.

## ALICIA RENEE

Debra Henne is the natural mother of Alicia Renee Henne, who was born on April 4, 1985. At the time of Alicia's birth, Debra Henne was married to Robert Henne, but at trial she offered her and Gary Brinton's sworn acknowledgements that Brinton is Alicia's biological father. Exhibits 6–7. Brinton also testified that he is Alicia's father. Debra Henne testified that Robert Henne has never claimed that he is the father of Alicia.

Following Alicia's birth, a hospital employee asked Debra Henne to complete a form for the birth certificate. The employee gave no instructions on completing it. The same employee provided Brinton, who was at the hospital, with a paternity form which he signed. Debra Henne recorded on the form that Brinton was the child's father and that her daughter's name was to be Alicia Renee Brinton. The employee subsequently told Debra Henne that she

could not give the name Brinton to Alicia because Debra Henne had been married to Robert Henne at the time that she conceived Alicia. Although Debra Henne changed Alicia's name to Henne on the form, she left blank the space provided for the father's name.

## QUINTESSA MARTHA

Linda Spidell is the mother of three girls. Her youngest daughter, Quintessa, was born in Nebraska on June 17, 1988. Spidell's other daughters, who were born in California, are named Zolena McKenzie and Madison McKenzie. Spidell testified that she chose the surname McKenzie for her daughters because she likes it. Both Spidell and Ray Duffer testified that Duffer is Madison's biological father. Although he has not signed an acknowledgment of paternity for Quintessa, Duffer testified that he is also Quintessa's father and that he would like to be identified as such on Quintessa's birth certificate. Spidell also testified that Duffer is Quintessa's father.

Spidell testified that after Quintessa's birth, she was contacted by a female employee of the hospital who gave her a form to complete for the child's birth certificate. Although she wanted to give Quintessa the same last name as her sisters', Spidell was told that she could not give Quintessa any surname other than Spidell. The employee also told Spidell that if she refused to complete the form, the hospital would sent it to the Bureau of Vital Statistics with the surname Spidell on the form for Quintessa.

## RIGHTS OF PRIVACY AND LIBERTY

The first issue is whether these parents have a constitutional right to choose the name to be given their children. In a long line of constitutional law cases decided by

---

(2) If the mother was not married at the time of either conception or birth of the child, or at any time between conception and birth, the name of the father shall not be entered on the certificate without the written consent of the mother and the person named as the father, in which case and upon the written request of both such parents the surname of the child shall be that of the father or the hyphenated surname of both parents;

(3) In any case in which paternity of a child is determine by a court of competent jurisdic-

tion, the name of the father shall be entered on the certificate in accordance with the finding or the court and the surname of the child may be entered on the certificate the same as the surname of the father;

(4) In all other cases, the surname of the child shall be the legal surname of the mother; and

(5) If the father is not named on the certificate, no other information about the father shall be entered thereon.

the Supreme Court of the United States, the Court has identified a constitutional right to privacy. Two of the first cases in this line pertain to parents' right to make choices for their children.

In *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Supreme Court stated:

Without doubt, [liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his [or her] own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness.... [Bracketed words added.]

*Id.* The *Meyer* Court held that "the right of parents to engage [a German language teacher] so to instruct their children ... [is] within the liberty of the Amendment." *Id.* at 400, 43 S.Ct. at 627.

In the case that is often cited with *Meyer*, *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925), the Court hinted at the unique protections afforded parents and children under the Constitution:

The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children.... The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Id.*

Throughout the legal development of the right to privacy, the struggle to identify the source of the right has overshadowed the discussion. However, when the Supreme Court decided *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), the significance of the right's derivation was diminished and the focus of the discussion turned to identifying the personal interests that the right to privacy pro-

tects. The *Roe* Court began its legal analysis of the issue presented to it with the following observations:

The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 [11 S.Ct. 1000, 1001, 35 L.Ed. 734] (1891), the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution. In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, in the Fourth and Fifth Amendments, in the penumbras of the Bill of Rights, in the Ninth Amendment; or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty" are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education.

*Id.* (Citations omitted). The Court concluded that the right to privacy, was, in its opinion, "founded in the Fourteenth Amendment's concept of personal liberty and the restrictions upon state action." The court was also quick to recognize that the specific right to privacy asserted in that case is not absolute and had to be considered "against important state interests in regulation." *Id.* 410 U.S. at 154, 93 S.Ct. at 727. The Court determined that fundamental rights may be regulated only by a "compelling state interest." *Id.* at 155, 93 S.Ct. at 728.

██ Given this precedent, I do not hesitate in concluding that a parent's right to name his or her child is protected under an extension of the right to privacy that is founded upon the Fourteenth Amendment's protection of individual liberty. Other federal district courts that have considered constitutional challenges to similar state

statutes have reached similar conclusions. *See Sydney v. Pingree,* 564 F.Supp. 412, 413 (S.D.Fla.1982) (finding that the constitutional right to liberty and privacy embodied in the Fourteenth Amendment protects parents' right to choose their child's name); *O'Brien v. Tilson,* 523 F.Supp. 494, 496 (E.D.N.C.1981) (holding that statute constituted an invasion of privacy and individual expression and violated the equal protection clause); *Jech v. Burch,* 466 F.Supp. 714, 719 (D.Hawaii 1979) (holding that parents' right to name their child fell within the liberty interest protected by the Fourteenth Amendment).

## STATE'S INTERESTS

 Since the constitution protects the freedom of choice exercised in naming one's child, the state may not interfere with that right arbitrarily. I now undertake to study the asserted state interests that are allegedly furthered by impinging upon this right. The defendants in this case assert several state interests that they characterize as compelling and, therefore, they contend that the state is justified in imposing restrictions on parents' choice of surnames for their children.

Though I am not certain where along the "rational continuum" of liberty the right to name one's child falls, I doubt that it can be infringed only upon a showing of a compelling state interest. *Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Harlan J. dissenting). Fortunately, I need not decide whether the interests need be more than legitimate because I find that the defendant's justifications fail to satisfy even this minimal standard.

Some of the interests asserted by the defendants are listed in defendant's Exhibit 15[2] and others are argued in the defendants' brief. Generally, three of the interests pertain to the system of recording certificates that is currently in place at the Bureau of Vital Statistics. Another pertains to protecting the "integrity of the family" and a related one to the protecting of the child "from the stigma of illegitimacy." The defendants also point to an interest in preventing persons unqualified in determining parental rights and responsibilities from possessing the power to ratify the parents' choice of their child's surname. The defendants also argue that the state has a legitimate interest in protecting men from false claims of paternity.

*Record-keeping*

I approach my consideration of the state's asserted interests in their indexing system ever mindful of the Court's admonishment in *Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972):

> [T]he Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

I recognize that the defendants have a legitimate interest in keeping accurate records. However, I see no reasonable relationship between the restrictions placed upon the parents' choice of names for their

---

2. The state interests listed are:
 a. Maintaining the accuracy and integrity of the vital records of the state.
 b. Protecting the integrity of the family.
 c. An indexing system which is related to the surnames of the parents facilitates searches for requested records.
 d. Such a system is less expensive and more effective to operate than one in which the surname of the child bears no relationship to the surnames of its parents.
 e. [The statute] is not an absolute bar to a broader choice of surnames than are permit-

ted by its provisions, but it does leave the balancing of the rights of the child, the rights of the mother and the rights of the presumed and/or actual father of the child to a judicial body, not to a clerk in the hospital or in the Bureau of Vital Statistics of the state....
 f. Abuses in regard to representations of paternity are so well recognized that testimony of the biological mother alone can not [sic] establish paternity.
 Exhibit 13.

child and the states' desire to keep accurate records. Provided that the parents honestly and accurately complete the form provided to them from which the information on the birth certificate is taken, I find that no threat is posed to the accuracy of the record by allowing the child to have a surname other than the names permitted under the Nebraska statute.

Another interest related to the accuracy of the records is the state's interest in ensuring that a child is named in such a way as to identify the child with his or her past. The only reason provided in the defendants' brief is that by identifying a person with his or her past, the state is better able to deter fraud, though the fraud that the state seeks to deter is not altogether clear. Again, the evidence does not demonstrate that there will be a threat to the accuracy of the records simply by permitting a child to have a surname different from his or her parents. An accurate record will ensure that the child can be identified with his or her past for medical or other purposes.

The defendants also assert that the state has a legitimate interest in the efficient and the inexpensive indexing and accessing of records. The evidence offered in regard to the methods employed by the Bureau of Vital Statistics to index and to access birth certificates revealed this much: When a child is born to a married woman, and the child is given the surname of the husband who is presumed to be the father, the child's record is indexed under the father's surname. If the married woman and her husband decide to give the child her maiden name, or a hyphenated combination of the father's and mother's surnames, then the child's record is indexed under both the father's and mother's surnames. If, due to a court order, the child's name is different from the father's surname and the mother's surname or their combination, then the child's record is indexed under the father's surname, the mother's surname and the child's surname. An unmarried woman, in the absence of an acknowledgement of paternity by the father and by herself, is free to name her child only by her legal surname and the child's record is indexed only under that name. The defendants also offered evidence to show that it is relatively more difficult to verify the records of a person whose surname is different from the surnames of both parents than to verify a record of a person whose surname is the same as either parent.

Whatever interest the state has in efficiency and keeping costs low is very weak in light of the fact that the system has and continues to have the capacity to accommodate triple indexing when the child's name is different from the mother's maiden or surname or the father's surname. The evidence does not reveal the extent to which the cost of indexing would increase or the efficiency of the system would decrease, given an increase in the number of records that require triple indexing. In keeping with the admonishment of the *Stanley* Court, I find that the state's interest in efficiency and cost savings loses its legitimacy when compared to the constitutional right at issue here.

*Legal Status of Parties*

The defendants contend that the statute furthers the state's compelling interest in protecting the "integrity of the family." In support of this argument, they cite a California state court decision that gave effect to a conclusive presumption under California law that a child born during the time when a husband and wife are married is legally the child of the husband. *Michael H. v. Gerald D.*, 191 Cal.App.3d 995, 236 Cal.Rptr. 810 (1987).

My response to the argument that the state has an interest in the integrity of the family is that the argument has nothing to do with the issue presented in this case. The issue here is whether parents have a right to name their children at the time of birth as they choose, free from state regulation. Several families in modern society are composed of persons whose surnames are different from each other. I find no reason to believe that permitting a father and mother to name their child with a surname other than one allowable under

the statute will do harm to the integrity of the family.

Another asserted interest is protecting a child from the "stigma of illegitimacy". A child who is born of parents who are not married, but whose mother is married, is presumed under Nebraska law to be legitimate. *Perkins v. Perkins*, 198 Neb. 401, 253 N.W.2d 42 (1977); *Craig v. Shea*, 102 Neb. 575, 168 N.W. 135 (1918). *See also*, Neb.Rev.Stat. § 42–377 (Reissue 1988). This presumption arises when there is an issue regarding the relationships between persons associated with the child and the child; it has nothing to do with the name that the child is entitled to be given by the parents. Like the state's asserted interest in the integrity of the family, I find that the state's interest in upholding its presumption in favor of legitimacy has nothing to do with the issue presented in this case. Accordingly, I conclude that there is no reasonable relationship between the legal status of a child as legitimate or otherwise and the limitation imposed by section 72–640.01. *See Doe v. Hancock County Bd. of Health*, 436 N.E.2d 791, 795–96 (Ind. 1982) (Hunter, J., dissenting).

### Need for Rule of Thumb

The defendants also assert that the statute is constitutional because the persons employed at the hospitals or at the Bureau of Vital Statistics are unqualified to balance the rights of the parties involved, and "rules of thumb" need to be provided them. Because the statute restricts the parent's choice of names, the inevitable result is that Bureau and hospital personnel are placed in the precarious position of informing some parents that the surnames that they have chosen for their children are not allowed. The hospital and Bureau personnel do not determine paternity rights and obligations under the statute, but rather, they enforce the statute with regard to newborns' names.

Any balancing that needs to be done in terms of naming a newborn is ordinarily done by the parents of that newborn, with consideration sometimes given to the opinions of relatives and friends. In *Cohee v. Cohee*, 210 Neb. 855, 317 N.W.2d 381 (1982), the Nebraska Supreme Court stated that "each parent has an equal right and interest in determining the surname of the child." My decision today does not invalidate the Nebraska court's observation, but serves to clarify that the right to determine the surname of a child is constitutional and cannot be disturbed by the state without justification. Though disputes may well develop in the naming of a child, there is no reason to believe—and certainly there is no evidence before me to indicate—that these disputes about last names will cause any more delay than deciding upon first names. *See O'Brien v. Tilson*, 523 F.Supp. at 497.

### Protecting Men from False Claims of Paternity

The state interest articulated by the defendants that causes some pause is in protecting men from false claims of paternity. Though a name does not declare the legal relationships between people, specifically here father to child, in a practical sense I recognize that there may be occasions when the naming of a child by an unwed mother could damage the reputation of a man by creating the appearance that he is the father of the child if, in fact, he is not the father.

Two observations are in order: One, if such an occurrence were to result in claimed damage, a court action for damages could afford relief. Two, the statute is patently over-broad if it has a goal of protecting wrongly accused men. It "protects" all men—men who are wrongly accused, men who are rightly accused, men who are not accused at all—except men who want no protection, as is true with both natural fathers in this case. It protects women not at all.

In *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973), the court said:

> ... To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep....

The overbreadth of the Nebraska's statute is real, as well as substantial, judged in relation to the slimness of its legitimate sweep.

In response to the defendant's argument that there are methods available to the plaintiffs for obtaining a name change after the birth, I quote from *Jech v. Burch,* 466 F.Supp. at 720:

> The statutory provision for change of name is not a substitute for the right to insist that one's child *at birth* was given the *original name* designated. This merely restates the first proposition that the naming of a child is protected against arbitrary or unreasonable state action.

*Id.* I agree with the *Jech* court's conclusion.

### JUDGMENT

IT IS ORDERED that Neb.Rev.Stat. § 71–640.01 is declared to be unconstitutional and that the defendants, their agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise, are therefore enjoined from further enforcement of the statute.

IT IS FURTHER ORDERED that the defendants shall (1) change the name on the birth certificate recording the birth of Alicia Renee Henne to Alicia Renee Brinton and (2) change the name on the birth certificate recording the birth of Quintessa Martha Spidell to Quintessa Martha McKenzie.