904 F.2d 1208
 58 USLW 2715, 16 Fed.R.Serv.3d 908
 Debra HENNE and Alicia Renee Henne, by her next friend,
Debra Henne, Appellee,
Linda Spidell and Quintessa Martha Spidell, by her next
friend, Linda Spidell, (Intervenor below), Appellee,
v.
Dr. Gregg F. WRIGHT, in his official capacity as Director,
Nebraska Department of Health; and Stanley S. Cooper, in
his official capacity as Director, Bureau of Vital
Statistics, Nebraska Department of Health, Appellants.
 No. 89-1919.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 12, 1989.
Decided May 23, 1990.
Rehearing and Rehearing En Banc Denied Aug. 1, 1990.
 
 Marilyn B. Hutchinson, Lincoln, Neb., for appellants.
 Roberta S. Stick, Lincoln, Neb., for appellees.
 Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Defendants Dr. Gregg F. Wright, M.D., Director of the Nebraska Department of Health, and Stanley S. Cooper, Director of the Nebraska Bureau of Vital Statistics, appeal the judgment of the district court granting plaintiffs Debra Henne and Linda Spidell declaratory and injunctive relief from a Nebraska statute that restricts the choice of surnames that can be entered on an infant's birth certificate.[1] Plaintiffs brought this action under 42 U.S.C. Sec. 1983 individually and as next friends to their daughters alleging that Neb.Rev.Stat. Sec. 71-640.01 (1986) unconstitutionally infringes their fundamental fourteenth amendment right to choose surnames for their daughters other than those prescribed. The defendants appeal, contending that the district court erred in the following respects: (1) plaintiffs lack standing; (2) plaintiffs failed to join certain parties necessary for a just adjudication under Fed.R.Civ.P. 19(a); and (3) Neb.Rev.Stat. Sec. 71-640.01 does not unconstitutionally infringe a fundamental right. We reject defendants' first two contentions but are persuaded by the third and therefore reverse.
 
 I. BACKGROUND
 
 2
 On April 4, 1985, Debra Henne gave birth to Alicia Renee Henne at a hospital in Lincoln, Nebraska. Following Alicia's birth, Debra completed a birth certificate form at the request of a hospital employee. Debra listed Gary Brinton as the father and entered the name Alicia Renee Brinton in the space provided for the child's name. Brinton, also present at the hospital, completed and signed a paternity form.
 
 
 3
 At the time of the birth, Debra was still married to Robert Henne. Although Debra and Robert Henne had filed for a divorce prior to Alicia's birth, the decree dissolving the marriage did not become final until after the birth. As a result of her marital status, hospital personnel, acting on instructions from the Department of Health, informed Debra that she could not surname her daughter "Brinton." Debra then filled out a second birth certificate form, entering the child's name as Alicia Renee Henne and leaving blank the space provided for the father's name. Robert Henne has never claimed to be Alicia's father and, pursuant to the divorce decree, pays no child support for her.
 
 
 4
 Almost three years later, on February 4, 1988, Debra Henne went in person to the Bureau of Vital Statistics of the Nebraska Department of Health and requested that Alicia's surname be changed to Brinton and that Gary Brinton be listed on the birth certificate as the father. Debra produced a signed statement personally acknowledging Gary Brinton as Alicia's biological father. She also presented a signed acknowledgement of paternity from Gary Brinton and a letter from him requesting that the birth certificate be changed. Personnel at the Bureau of Vital Statistics, acting indirectly at the direction of defendants Cooper and Wright, denied Debra's request. Other than her visit to the Bureau of Vital Statistics and this action, Debra has made no attempt to change Alicia's surname.
 
 
 5
 On June 17, 1988, at St. Elizabeth's Hospital in Lincoln, Nebraska, Linda Spidell gave birth to a daughter, Quintessa Martha Spidell. Linda wished to give Quintessa the surname "McKenzie," the same surname as her other two children, who were born in California. Hospital personnel, acting upon instructions from the Department of Health, informed Linda that Quintessa could not be surnamed McKenzie and that if Linda did not complete the birth certificate form the hospital would enter Quintessa's last name as Spidell. Linda completed the form, entering "Spidell" as Quintessa's surname and leaving blank the space provided for the father's name.
 
 
 6
 Linda surnamed her other children McKenzie simply because she liked that name and not because of any familial connection. For that reason, and because she wishes all three children to share the same name, she wants Quintessa surnamed McKenzie. Linda was not married at the time of Quintessa's birth or at the time of this action and there has been no judicial determination of paternity. At trial, however, both Linda and Ray Duffer, who lives with Linda and her children, testified that Duffer is Quintessa's biological father. Other than this action, Linda has made no attempt to change Quintessa's surname.
 
 
 7
 Defendant Dr. Gregg F. Wright heads the Nebraska Department of Health. The Nebraska Department of Health assists the governor in executing and administering certain laws, including Neb.Rev.Stat. Sec. 71-640.01, the law at issue in this action. Defendant Stanley S. Cooper directs the Bureau of Vital Statistics of the Nebraska Department of Health. In this capacity he ensures that all birth records are filed and maintained in accordance with the laws of Nebraska, including section 71-640.01.
 
 
 8
 These defendants and the Nebraska Department of Health are responsible for furnishing forms and instructions for use in completing birth certificates to hospitals throughout Nebraska. These birth certificate forms and instructions implement Neb.Rev.Stat. Sec. 71-640.01, which restricts the choice of surnames that can be entered on a birth certificate. Hospital personnel and Nebraska authorities denied plaintiffs their choice of surnames pursuant to this statute.
 
 
 9
 Debra Henne brought this suit on behalf of herself and her minor child Alicia Renee Henne in federal district court against defendants Wright and Cooper in their official capacities, alleging that Neb.Rev.Stat. Sec. 71-640.01, as implemented and enforced by defendants, violated the Federal Constitution. Linda Spidell later intervened as an additional plaintiff on her own behalf and on behalf of her minor child Quintessa Martha Spidell.
 
 
 10
 Following a bench trial, the court ruled that the constitutional right to privacy protects a parent's right to name his or her child. The court did not specifically identify the appropriate level of scrutiny by which to examine Neb.Rev.Stat. Sec. 71-640.01. The court held that the justifications for the statute asserted by the defendants failed to satisfy even a minimal level of constitutional scrutiny. Accordingly, the court entered judgment declaring section 71-640.01 unconstitutional, enjoining its enforcement and ordering defendants to change the names on Alicia's and Quintessa's birth certificates. Defendants timely appealed, moving for a stay of the judgment pending appeal. The district court denied the motion but this court subsequently granted a stay pending disposition on appeal.
 
 II. DISCUSSION
 
 11
 Defendants argue (1) that the plaintiffs lack article III standing, (2) that plaintiffs failed to join certain necessary parties under Fed.R.Civ.P. 19(a) and (3) that the district court erred in holding Neb.Rev.Stat. Sec. 71-640.01 unconstitutional. We address these arguments in turn.[2]
 
 A. Article III Standing
 
 12
 Standing refers to the article III requirement that federal courts only adjudicate actual, ongoing cases or controversies. In order to have article III standing, the plaintiffs must allege an actual or threatened injury in fact as a result of defendants' conduct. In addition, the injury alleged must be fairly traceable to the defendants' conduct and must be likely to be redressed by a favorable decision of the court. Belles v. Schweiker, 720 F.2d 509, 513 (8th Cir.1983) (citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).
 
 
 13
 Here defendants argue that plaintiffs lack standing because the alleged constitutional injury did not result from defendants' conduct but from the conduct of unnamed hospital personnel. We reject this contention. The plaintiffs have alleged that their constitutional right to choose surnames for their children has been infringed by defendants' enforcement and administration of Neb.Rev.Stat. Sec. 71-640.01. Because defendants furnish the forms and instructions by which hospital personnel in Nebraska effect the surname restrictions, plaintiffs' action directly challenges the conduct of defendants. See Amended Complaint pp 16, 17; Complaint of Intervenor pp 16, 17.
 
 
 14
 Defendants also argue that plaintiffs' injury resulted not from defendants' conduct but from plaintiffs' failure to obtain judicial determinations of paternity. Defendants therefore contend that the required causal connection between the challenged conduct and plaintiffs' injury has not been established. With respect to Linda Spidell, the statute prohibits her from giving Quintessa the surname McKenzie even with a judicial determination of paternity. Moreover, the gravamen of plaintiffs' constitutional claim is that they have a right to choose surnames for their daughters without clearing legal hurdles imposed by the state, such as paternity proceedings. The existence of other avenues by which the plaintiffs may exercise their rights might bear on whether plaintiffs have suffered constitutional injury, but it does not bear on the threshold question of standing.
 
 
 15
 Defendants further contend that plaintiffs could use the desired surnames without holding the statute unconstitutional. This simply represents a reformulation of the previous argument and we reject it for the same reasons. Plaintiffs have alleged sufficient injury in fact to bring this action in federal court.
 
 B. Necessary Parties
 
 16
 Defendants next argue that the district court erred by entering judgment ordering the surnames changed on the birth certificates without first requiring joinder of necessary parties under Fed.R.Civ.P. 19(a).[3] Specifically, defendants contend that Alicia's name could not be changed without first joining the presumed father (Robert Henne), the putative father (Gary Brinton) and a guardian ad litem to protect Alicia's interests. Defendants raised this argument prior to trial and the district court ruled that in the absence of these parties it could nevertheless grant the other relief requested if plaintiffs prevailed on their constitutional claim. The plaintiffs did prevail before the district court and, despite its earlier ruling, in addition to declaring the statute unconstitutional and enjoining its enforcement, the court ordered the names changed.
 
 
 17
 Defendants apparently concede that the district court had jurisdiction to declare the statute unconstitutional and enjoin its enforcement without requiring the joinder of any absent parties.[4] Thus, the only issue presented is whether the district court erred in not requiring the joinder of the absent parties before ordering the names changed. We need not enter this thicket because, as discussed in the next section, we reject plaintiffs' constitutional claim.
 
 C. Fundamental Right
 
 18
 Defendants contend that the district court erred in holding Neb.Rev.Stat. Sec. 71-640.01[5] unconstitutional. The district court held that an extension of the fourteenth amendment right of privacy protects a parent's right to name his or her child and that the statute failed to survive even minimal scrutiny. We determine that the fourteenth amendment right of privacy does not protect the specific right at issue here and that the statute rationally furthers legitimate state interests.
 
 
 19
 This case presents the issue whether a parent has a fundamental right to give a child a surname at birth with which the child has no legally established parental connection. We frame the issue this way because each plaintiff wishes to enter on her daughter's birth certificate a surname proscribed by section 71-640.01. Debra Henne wishes to enter the surname of the alleged father (Brinton) without first obtaining a judicial determination of paternity. Linda Spidell wishes to enter a surname (McKenzie) with which her daughter has no connection other than that Linda has already given that name to her two other children. We note, however, that while section 71-640.01 requires that a child have some legally established parental connection to the surname entered on the birth certificate,[6] it does not prevent either plaintiff from ever giving her daughter the desired surname.[7] The district court overlooked this important distinction in characterizing the issue as whether parents generally possess a fundamental right to name a child. This case does not present that broad issue.
 
 
 20
 Whether there is a fundamental right to give a child a surname at birth with which the child has no legally established parental connection will dictate the appropriate level of constitutional scrutiny for evaluating Neb.Rev.Stat. Sec. 71-640.01. Specifically, if the statute significantly infringes a right deemed fundamental under the fourteenth amendment right of privacy then we must rigorously scrutinize the asserted justifications for the statute. See Zablocki v. Redhail, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978); Woods v. Holy Cross Hosp., 591 F.2d 1164, 1176 (5th Cir.1979). Otherwise, we analyze the statute under the highly deferential rational basis standard of review applicable to most economic and social legislation challenged under the fourteenth amendment. See Williamson v. Lee Optical, Inc., 348 U.S. 483, 486-88, 75 S.Ct. 461, 463-64, 99 L.Ed. 563 (1955); Scott v. City of Sioux City, 736 F.2d 1207, 1216 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).
 
 
 21
 We now turn to the question whether the right at issue is fundamental. A long line of Supreme Court cases have established that "liberty" under the fourteenth amendment encompasses a right of personal privacy to make certain decisions free from intrusive governmental regulation absent compelling justification. See, e.g., Zablocki v. Redhail, 434 U.S. at 374, 98 S.Ct. at 673 (fundamental right to marriage); Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (fundamental right to live with relatives); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (fundamental right to an abortion); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (fundamental right to interracial marriage). Two of the earliest right to privacy cases, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (fundamental right to instruct a child in a foreign language), and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (fundamental right to send child to a non-public school), established the existence of a fundamental right to make child rearing decisions free from unwarranted governmental intrusion. See Roe v. Wade, 410 U.S. at 153, 93 S.Ct. at 727. Meyer and Pierce do not, however, establish an absolute parental right to make decisions relating to children free from government regulation. See Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("[N]either rights of religion nor rights of parenthood are beyond limitation"); Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972) (state has legitimate interest in separating neglectful parents from child); Jehovah's Witnesses v. King County Hosp., 278 F.Supp. 488, 504 (W.D.Wash.1967) (three judge panel) (state may intervene in parents' religiously motivated decision refusing medically necessary blood transfusion for children), aff'd, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam).
 
 
 22
 In determining whether a right not enumerated in the Constitution qualifies as fundamental, we ask whether the right is "deeply rooted in this Nation's history and tradition," Moore v. City of East Cleveland, 431 U.S. at 503, 97 S.Ct. at 1938. We proceed cautiously in this area of the law, ever mindful that the judiciary "is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution." Id. at 544, 97 S.Ct. at 1958 (White, J., dissenting).
 
 
 23
 While Meyer and Pierce extended constitutional protection to parental decisions relating to child rearing, the parental rights recognized in those cases centered primarily around the training and education of children. For example, the law at issue in Meyer prevented parents from having their children taught in a foreign language, 262 U.S. at 396-403, 43 S.Ct. at 626-28, and the law at issue in Pierce prevented parents from sending their children to non-public schools, 268 U.S. at 529-36, 45 S.Ct. at 571-74. By contrast, the parental decision in this case relates to the choice of a child's surname. This subject possesses little, if any, inherent resemblance to the parental rights of training and education recognized by Meyer and Pierce. Thus, as the district court rightly recognized, constitutional protection for the right to choose a non-parental surname at birth must flow, if at all, from an extension of Meyer and Pierce. Furthermore, any logical extension of Meyer and Pierce has to be grounded in the tradition and history of this nation. See Moore v. City of East Cleveland, 431 U.S. at 503, 97 S.Ct. at 1938; Bowers v. Hardwick, 478 U.S. 186, 192, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986). Given this standard, we necessarily conclude that plaintiffs have presented no fundamental right.
 
 
 24
 The custom in this country has always been that a child born in lawful wedlock receives the surname of the father at birth, see, e.g., Secretary of the Commonwealth v. City of Lowell, 373 Mass. 178, 366 N.E.2d 717, 725 (1977); Firman v. Firman, 187 Mont. 465, 610 P.2d 178, 181 (1980); Sobel v. Sobel, 46 N.J.Super. 284, 134 A.2d 598, 600 (Ch.Div.1957); Smith v. United States Cas. Co., 197 N.Y. 420, 90 N.E. 947, 948 (1910); Kay v. Bell, 95 Ohio App. 520, 121 N.E.2d 206, 208 (1953); Doe v. Dunning, 87 Wash.2d 50, 549 P.2d 1, 3 (1976); see generally 57 Am.Jur.2d Name Secs. 2, 3 (1988); 65 C.J.S. Names Sec. 3 (1966), and that a child born out of wedlock receives the surname of the mother at birth, see, e.g., Buckley v. State, 19 Ala.App. 508, 98 So. 362, 363 (1923); Donald J. v. Evna M.W., 81 Cal.App.3d 929, 147 Cal.Rptr. 15, 19 (1978); Pintor v. Martinez, 202 S.W.2d 333, 335 (Tex.Civ.App.1947).
 
 
 25
 While some married parents now may wish to give their children the surname of the mother or a hyphenated surname consisting of both parents' surname, and some unmarried mothers may wish to give their children the surname of the father, we can find no American tradition to support the extension of the right of privacy to cover the right of a parent to give a child a surname with which that child has no legally recognized parental connection. Plaintiffs therefore have not asserted a right that is fundamental under the fourteenth amendment right of privacy and Neb.Rev.Stat. Sec. 71-640.01 need only rationally further legitimate state interests to withstand constitutional scrutiny.
 
 
 26
 The district court in this case held that section 71-640.01 failed to survive even minimal scrutiny. Other federal courts reviewing statutes restricting the choice of surnames have taken similar positions. Sydney v. Pingree, 564 F.Supp. 412, 413 (S.D.Fla.1982); O'Brien v. Tilson, 523 F.Supp. 494, 496 (E.D.N.C.1981); Jech v. Burch, 466 F.Supp. 714, 721 (D.Hawaii 1979). Nevertheless, for the reasons discussed below, we determine that the Nebraska statute passes minimal scrutiny, i.e., the rational basis test.
 
 
 27
 A law must be upheld under the rational basis test unless it bears no rational relation to a legitimate state interest. United States v. Fogarty, 692 F.2d 542, 547 (8th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983). " 'It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.' " Id. (quoting Williamson v. Lee Optical, Inc., 348 U.S. at 488, 75 S.Ct. at 464).
 
 
 28
 We determine that the law rationally furthers at least three legitimate state interests: the state's interest in promoting the welfare of children, the state's interest in insuring that the names of its citizens are not appropriated for improper purposes and the state's interest in inexpensive and efficient record keeping. Specifically, a reasonable legislature could believe that in most cases a child's welfare is served by bearing a surname possessing a connection with at least one legally verifiable parent. Furthermore, the legislature could reasonably perceive that in the absence of a law such as section 71-640.01, the name of a non-parent could be improperly appropriated to achieve a deliberately misleading purpose, such as the creation of a false implication of paternity. Finally, the legislature could reasonably conclude that it is easier and cheaper to verify and index the birth records of a person who has a surname in common with at least one legally verifiable parent. The district court's review of the evidence buttresses this conclusion. 711 F.Supp. at 515.[8] Although the Nebraska legislature could perhaps tailor the statute to more closely serve these purposes, we cannot say that section 71-640.01 bears no rational relationship to the state's legitimate interests. We therefore reject plaintiffs' contention that Neb.Rev.Stat. Sec. 71-640.01 unconstitutionally restricts their parental rights.III. CONCLUSION
 
 
 29
 Accordingly, the district court's judgment is reversed.
 
 
 30
 ARNOLD, Circuit Judge, concurring in part and dissenting in part.
 
 
 31
 I agree with the Court that the plaintiffs have standing to sue. I would also reject the defendants' contention that there was a failure to join necessary parties. To that extent, I concur in Parts II.A and II.B of the Court's opinion. But on the merits, I respectfully dissent. The fundamental right of privacy, in my view, includes the right of parents to name their own children, and the State has shown no interest on the facts of these cases sufficiently compelling to override that right. So I cast my vote to affirm the judgment of the District Court, holding invalid as applied to these cases Neb.Rev.Stat. Sec. 71-640.01 (1986).
 
 
 32
 A few salient facts are worth repeating. Debra Henne wants to give her daughter the surname of the little girl's father. The father is willing. He has acknowledged his fatherhood. The man to whom Ms. Henne was married when the baby was born has no objection. Linda Spidell wants to name her daughter "McKenzie," which is neither her name nor the name of the child's father. The choice is not so eccentric as it seems, however: Ms. Spidell's two other children are named "McKenzie," and it is quite natural to desire that all of one's three children have the same surname. Again, no one with a personal interest objects. Ray Duffer, the man who lives with Ms. Spidell, is the child's father, and "McKenzie" is fine with him.
 
 
 33
 The government, in the person of the State of Nebraska, says no to both mothers. The most plausible reason it offers is administrative convenience.[1] Records are easier to keep and use if every person has the surname of "at least one legally verifiable parent." Ante, at 1215. This interest is legitimate, and the statute under challenge is rationally related to it. If the appropriate level of constitutional scrutiny were the rational-basis test, I would agree that the law is valid. But if a fundamental right is at stake, the State must show a compelling interest, which it has wholly failed to do. So the case comes down to this: Do parents have a fundamental right to name their own children?
 
 
 34
 The question could well be analyzed as a First Amendment issue. What I call myself or my child is an aspect of speech. When the State says I cannot call my child what I want to call her, my freedom of expression, both oral and written, is lessened. And if the First Amendment is at stake, everyone would concede that the State could not win without showing a compelling interest. But the parties have not presented the case in First Amendment terms, either here or in the District Court. It would be unfair for an appellate court to decide the case on that basis, at least without a chance for additional briefing.
 
 
 35
 So we address the case in terms of the right of privacy. This is trickier ground than the First Amendment. There is a Speech Clause, but no "Privacy Clause" as such. The right of privacy is not the beneficiary of explicit textual protection in the federal Constitution. It is an unenumerated right. There are such things in constitutional law, however. We know that much (if we know little else) from the Ninth Amendment. The Founders of this Nation deeply believed that the individual took primacy over government. People existed, and had rights, before there was such a thing as government. Government might protect or recognize rights, but rights, some of them anyway, existed before government and independently of it, and would continue to exist after government had been destroyed. The source of rights was not the State, but, as the Declaration of Independence put it, the "Creator."
 
 
 36
 It is perfectly true, and the Court is right to emphasize, that unelected judges should tread with great caution when dealing "with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution." Moore v. City of East Cleveland, 431 U.S. 494, 544, 97 S.Ct. 1932, 1958, 52 L.Ed.2d 531 (1977) (White, J., dissenting). But the proposition that unenumerated rights exist is both textually demonstrable (the Ninth Amendment) and sanctified by Supreme Court precedent. The right to travel, for example, was recognized long before the modern debate over the right of privacy, and even before the passage of the Due Process Clause of the Fourteenth Amendment, with its open-ended reference to liberty, created a textual basis for limitations on the power of States not contained in the words of the original Constitution. See Crandall v. Nevada, 73 U.S. (6 Wall) 35, 18 L.Ed. 744 (1867).
 
 
 37
 The real question is, not whether there is a right of privacy (see also the Fourth Amendment for a modicum of textual support), but how do you tell what it includes? The limits of the right remain controversial, and no doubt they will continue to be tested by litigation. Precedent tells us at least this much, though: family matters, including decisions relating to child rearing and marriage, are on almost everyone's list of fundamental rights. See, e.g., Zablocki v. Redhail, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978), and the other cases cited by the Court, ante, at 1214. The right to name one's child seems to me, if anything, more personal and intimate, less likely to affect people outside the family, than the right to send the child to a private school, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), or to have the child learn German, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). We know, moreover, from Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that these women had a fundamental right to prevent their children from being born in the first place. It is a bizarre rule of law indeed that says they cannot name the children once they are born. If there was ever a case of the greater including the less, this ought to be it.
 
 
 38
 So I do not see the right being claimed here as an "extension," ante, at 1214, of prior cases. It is rather well within the principle of those cases. A person's name is, in a sense, her identity, her personality, her being. I take it the Court would not deny a citizen the right to choose her own name, absent some compelling governmental interest. No more should we deny her the right to choose her child's name. The child has, at birth, no will of her own, and her parents should be allowed to speak for her. There is something sacred about a name. It is our own business, not the government's.
 
 
 39
 Having labeled the present claim as an "extension" of existing law, the Court goes on to say that extensions may be permitted only if they are "deeply rooted in this Nation's history and tradition," Moore v. City of East Cleveland, supra, 431 U.S. at 503, 97 S.Ct. at 1938. It then asks whether there is an "American tradition to support the extension of the right of privacy to cover the right of a parent to give a child a surname with which that child has no legally recognized parental connection." Ante, at 1215. Having satisfied itself that there is no such tradition, the Court rejects what it characterizes as an "extension" of the right of privacy.
 
 
 40
 As is often the case, how one phrases a question has a great deal to do with the answer one gets. To illustrate the point, I refer to some aspects of tradition about names that the Court does not mention. In the beginning, surnames were unknown. They "were not considered of controlling importance until the reign of Queen Elizabeth, 1558-1603." Note, What's in a Name?, 2 N.Y.L.Rev. 1, 1 (1924). "The surname, in its origin, was not, as a rule, inherited from the father, but was either voluntarily adopted by the son or conferred upon him by his neighbors...." Ibid.[2] Fundamentally, names were not inherited. They were something people chose for themselves. "There [was] no such thing as the 'legal name' of a person in the sense that he may not lawfully adopt or acquire another. By the common law a man [sic] may name himself, or change his name at will, and this without solemnity or formality of any kind; or he may acquire a name by reputation, general usage or habit." Id. at 2 (citations omitted). Even after statutes were passed to provide a fixed procedure for changing one's name, the statutes were treated as merely supplementary to the common law. One could use the statute if desired, but the old do-it-yourself right simply to assume a new name still existed. Smith v. United States Cas. Co., 197 N.Y. 420, 90 N.E. 947, 950 (1910).
 
 
 41
 The early tradition, then, did not restrict one's own choice of a surname. You could freely select any name you chose, whether it was your parents' surname or not. "The ancient custom was for the son to adopt a surname at will, regardless of that borne by his father," Smith, supra, 90 N.E. at 949. And even after this custom had fallen into disuse, and people had begun automatically to assume the surnames of their fathers, " 'there [was] nothing in law prohibiting a man from taking another name if he chooses.' " Ibid, quoting In re Snook, 2 Hilt. 566 (N.Y.Ct. Common Pleas 1859). Names were people's own business, not the government's. One's name did not have to be that of a legally recognized parent.
 
 
 42
 The best example of this tradition I have found is Doe ex dem. Luscombe v. Yates, 5 B. & Ald. 544, 106 Eng.Rep. 1289 (K.B.1822). Luscombe devised his estate to one Manning, provided that within three years he should cause his name "to be altered and changed to my name of Luscombe, by act or acts of Parliament, or some other effectual way for that purpose." In default of the name change, the devise was to be void. Without securing an Act of Parliament or obtaining a license from the King, Manning simply adopted the name of Luscombe and used it for all purposes and exclusively. The Court held the devise was good. Abbott, C.J., said: "A name assumed by the voluntary act of a young man at his outset into life, adopted by all who knew him and by which he is constantly called, becomes for all purposes that occur to my mind as much and effectually his name as if he had obtained an act of Parliament to confer it upon him." 5 B. & Ald. at 556, 106 Eng.Rep. at 1294. Land was serious business to the law of England, and we can be sure that a name change made without governmental sanction, if effective to confirm a devise of land, was effective for all purposes whatsoever.
 
 
 43
 The cases cited so far on the question of tradition are all rather old; and it may fairly be asked, whether any tradition that once existed still obtains. There is good evidence that the answer is yes. See, e.g., Hauser v. Callaway, 36 F.2d 667, 669 (8th Cir.1929) ("A man's name for all practical and legal purposes is the name by which he is known and called in the community where he lives and is best known."). The most recent case on the point I have found, Walker v. Jackson, 391 F.Supp. 1395, 1402 (E.D.Ark.1975) (three-judge court) (Webster, Henley, and Eisele, JJ.), squarely holds that under the common law of Arkansas--which has not been changed by statute--a person can change his name at will in the absence of fraud.
 
 
 44
 So far as the choice of one's own name is concerned, then, it seems well established that the tradition, still extant, is a complete absence of statutory prohibition. Certainly there is no pattern of positive law denying such a right of self-determination. I take it that the Court would concede that there is a fundamental right to choose one's own name. There is no "societal tradition of enacting laws denying [this] interest," Michael H. v. Gerald D., --- U.S. ----, 109 S.Ct. 2333, 2341 n. 2, 105 L.Ed.2d 91 (1989) (plurality opinion) (emphasis in original), and that seems to be the standard that has recently attracted more votes than any other on the Supreme Court.
 
 
 45
 This Court, however, phrases the question more narrowly: is there a tradition supporting "the right of a parent to give a child a surname with which that child has no legally recognized parental connection"? Ante, at 1215. I grant that there is no such tradition: what the plaintiffs in this case want to do is unusual. Few parents, no doubt, have done or wanted to do it in the past, and few would want to do it now. But, by the same token, there is no solid tradition of legislation denying any such right, and under Michael H., supra, that is the relevant question. In the absence of any tradition either way on the precise point, we should look, I submit, to the tradition we do have. People may choose or change their own names without leave of government. It is only a small step to extend the same right to their children's names. Children are, during infancy anyway, simply legal extensions of their parents for many purposes.
 
 
 46
 So I would hold that the right asserted here is fundamental, and that the State has no interest compelling enough to override it in the circumstances of this case. In attempting to do so, the State intrudes intolerably into what should be a private decision, one of the basic liberties of the citizen. I respectfully dissent from the judgment of reversal.
 
 
 
 [1]
 The district court's opinion is reported. Henne v. Wright, 711 F.Supp. 511 (D.Neb.1989)
 
 
 [2]
 In their reply brief, defendants also argue that they cannot be sued in their official capacities as "persons" under 42 U.S.C. Sec. 1983. In an action for prospective relief such as this, however, state officials sued in their official capacity are treated as "persons" under section 1983. Will v. Michigan Dept. of State Police, --- U.S. ----, 109 S.Ct. 2304, 2311-12 n. 10, 105 L.Ed.2d 45 (1989). Cf. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (state official sued for prospective relief on constitutional grounds not shielded by eleventh amendment)
 
 
 [3]
 Fed.R.Civ.P. 19(a) states:
 A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
 
 
 [4]
 The requirement under Rule 19(a)(1) that complete relief be available does not mean that every type of relief sought must be available, only that meaningful relief be available. 3A J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice p 19.07-1 (2d ed. 1989). In this case, meaningful relief consisted of a declaratory judgment and a prohibitory injunction. The district court could grant this relief without impairing the absent parties' ability to protect their interest under Fed.R.Civ.P. 19(a)(2)(i) because the defendants are making every argument on the merits that the absent parties would or could make, Rochester Methodist Hosp. v. Travelers Ins. Co., 728 F.2d 1006, 1016 (8th Cir.1984). Finally, with respect to the declaratory judgment and the prohibitory injunction, there was no chance that the defendants would be subject to multiple or inconsistent obligations as a result of any interests claimed by the absent parties. Fed.R.Civ.P. 19(a)(2)(ii)
 
 
 [5]
 Section 71-640.01 states:
 The information pertaining to the name of an infant born in this state and reported on a birth certificate, filled out and filed pursuant to sections 71-601 to 71-648, shall comply with the following:
 (1) If the mother was married at the time of either conception or birth of the child, or at any time between conception and birth, the name of such mother's husband shall be entered on the certificate as the father of the child and the surname of the child shall be entered on the certificate as being (a) the same as that of the husband, unless paternity has been determined otherwise by a court of competent jurisdiction, (b) the surname of the mother, (c) the maiden surname of the mother, or (d) the hyphenated surname of both parents;
 (2) If the mother was not married at the time of either conception or birth of the child, or at any time between conception and birth, the name of the father shall not be entered on the certificate without the written consent of the mother and the person named as the father, in which case and upon the written request of both such parents the surname of the child shall be that of the father or the hyphenated surname of both parents;
 (3) In any case in which paternity of a child is determined by a court of competent jurisdiction, the name of the father shall be entered on the certificate in accordance with the finding of the court and the surname of the child may be entered on the certificate the same as the surname of the father;
 (4) In all other cases, the surname of the child shall be the legal surname of the mother; and
 (5) If the father is not named on the certificate, no other information about the father shall be entered thereon.
 
 
 [6]
 Thus, Alicia Henne could have been given her mother's surname, her mother's maiden surname or the surname of the presumed father, but not the surname of the alleged father without a judicial determination of paternity. Neb.Rev.Stat. Sec. 71-640.01(1). Quintessa Spidell could have been given her mother's surname, id. Sec. 71-640.01(4), the surname of a person named as the father if that person requested so in writing, id. Sec. 71-640.01(2), or the surname of a person found by a court of competent jurisdiction to be the father, id. Sec. 71-640.01(3)
 
 
 [7]
 Debra Henne could enter the surname Brinton on her daughter's birth certificate by obtaining a judicial determination of paternity on the part of Gary Brinton. Neb.Rev.Stat. Sec. 71-640.01(1)(a). Linda Spidell could enter the surname McKenzie on her daughter's birth certificate only by first changing her own surname to McKenzie. Nebraska law provides a procedure, however, whereby either child's name could later be changed. Neb.Rev.Stat. Secs. 61-101 to 61-104 (1986). See also Spatz v. Spatz, 199 Neb. 332, 258 N.W.2d 814 (1977). Moreover, under Nebraska law any civil action can be brought in forma pauperis if necessary. Neb.Rev.Stat. Secs. 25-2301 to 25-2310 (1986 & Supp.1988)
 
 
 [8]
 The district court noted that the defendants offered evidence that section 71-640.01 promotes inexpensive and efficient indexing and access of birth records. Nevertheless, the court stated that "[i]n keeping with the admonishment of [Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) ], I find that the state's interest in efficiency and cost savings loses its legitimacy when compared to the constitutional right at issue here." 711 F.Supp. at 515. In Stanley, the Supreme Court in effect ruled that the state's interests in administrative efficiency did not withstand heightened scrutiny. Here, however, defendants need only demonstrate that the law rationally furthers legitimate state interests
 
 
 [1]
 It is also true, as the Court says, ante, at 1215, that allowing an unfettered choice of surname could enable parents to imply falsely that someone was the father of the child. In the example I put at the oral argument, I would have an interest in keeping a stranger from naming her child "Richard S. Arnold, Jr.," and the State would have an interest in defending my reputation against such a false implication. Nothing of the kind is involved in the present cases. Moreover, the State might have an interest in the matter if the child's parents could not agree on a surname. Again, no such issue is presented by these cases
 
 
 [2]
 The older authorities on names uniformly refer to "fathers," "sons," and what "a man" might choose for a name. I take it everyone would concede today that mothers, daughters, and women in general are legally entitled to the benefit of whatever tradition was formerly expressed in male terms